IN THE UNITED STATES DISTRICT COURT
FOR THE SOUTHERN DISTRICT OF FLORIDA

Case No. 09-MC-21020-HUCK-O'SULLIVAN

In The Matter Of Arbitration Between

SMITH BARNEY, a division of
CITIGROUP GLOBAL MARKETS, INC.,

    Petitioner,

-and-

ALEXIS BRUNET,

    Respondent.

### REPLY IN SUPPORT OF PETITION TO COMPEL ARBITRATION

Pursuant to Local Rule 7.1(C) of the United States District Court for the Southern District of Florida, Petitioner Smith Barney, a division of Citigroup Global Markets, Inc. ("Smith Barney"), respectfully submits its reply in support of its Petition to Compel Arbitration (the "Petition").

### I.  INTRODUCTION

Respondent's Memorandum in Opposition to the Petition to Compel Arbitration (the "Opposition") [D.E. No. 5] unnecessarily complicates the law.  Railing against what Respondent views as Smith Barney's pronouncements of law and fact, the Opposition completely ignores the plain language of applicable legal precedent and obfuscates the pertinent issues.

New York law is, in fact, really not very complicated at all.[1]  Under the Federal Arbitration Act, an obligation to arbitrate does not attach only to one who has personally signed a written arbitration provision.  *Thomson-CSF, S.A. v. Am. Arbitration Ass'n*, 64 F.3d 773, 776

---

[1] The Client Agreement calls for the application of New York law.

(2d Cir. 1995). A non-signatory party may be bound to an arbitration agreement if so dictated by the ordinary principles of contract and agency. *Id.* Accordingly, five theories for binding non-signatories to arbitration agreements have been recognized: (1) incorporation by reference; (2) assumption; (3) agency; (4) veil piercing/alter ego and (5) estoppel. *Id.* This Court, in applying New York law, has held the same; that a willing signatory seeking to compel an unwilling non-signatory into arbitration may do so upon establishing one of the above theories. *Am. Personality Photos, LLC v. Mason*, 2008 U.S. Dist. LEXIS 107673, *11 (S.D. Fla. 2008).

Respondent does not dispute that he was an agent of MHG, the signatory to the Client Agreement.[2] He is bound to arbitrate on those grounds alone. Additionally, he received a direct benefit from the Client Agreement, and is thus estopped to avoid arbitration. Perhaps most important, however, is the fact that he was a beneficial owner of MHG, despite his desperate (and false) assertions to the contrary. As a beneficial owner of MHG (which Respondent now claims is dissolved), he is quite obviously subject to the Client Agreement and bound by the arbitration provision contained therein.

## II.   ARGUMENT

A.   **Respondent Is Estopped To Deny His Beneficial Ownership Of MHG.**

Respondent's denials of the factual contentions contained in the Petition are, at best, not warranted based on the evidence, and at worst, outright fabrications. He presumably makes these assertions to distance himself from the improper actions he took with respect to the account at issue (the "Account"), and astonishingly, certifies under penalties of perjury, that he was not an owner of MHG or the Account:

Mr. Brunet is not "a beneficial owner of MHG." Opposition at 2.

---

[2] Respondent admits that he was an agent in Headnote A of the Opposition, which describes him as a "Non-Signatory Agent." Opposition at 7.

958814-1                                                   2

> Mr. Brunet has no ownership interest in either MHG or its Smith Barney account. *Id.*
>
> I have never claimed to be, nor have I ever been, a beneficial owner of the Smith Barney account, in MHG or in MHG Trust, the entity that was the sole shareholder of MHG. Declaration of Alexis Brunet at ¶8.
>
> At no time before, during or since Pinnacle managed investments for MHG, was I a beneficiary, grantor or settler of the MHG Trust. *Id.* at ¶9.

Each of these statements is directly contradicted by the Client Representation, which was signed by Respondent on December 12, 2002. Exhibit A. In the Client Representation, Respondent clearly lists himself as a beneficial owner of MHG, and states that he had not only an ownership interest in the Account, but a direct financial interest. *Id.* at n.1. It is thus somewhat shocking that Respondent can now claim to this Court - under penalties of perjury, no less - that he was not, and never claimed to be, a beneficial owner of MHG or the Account.

> Respondent also states,
>
> In or about 2003, MHG opened an account with Smith Barney in the name and for the benefit of MHG. At the time, Smith Barney requested and received copies of passports of the beneficial owners of that account.

Declaration of Alexis Brunet at ¶4. In making this statement, Respondent attempts to bolster his contention that he was not a beneficial owner of either MHG or the Account by implying to the Court that the passports at issue belonged to individuals other than himself. But the only passport provided to Smith Barney in connection with the opening of the Account was that of Alexis Brunet. Exhibit B. Smith Barney therefore concedes the veracity of the above statement, even while disputing Respondent's implication that others owned the Account.

958814-1 3

Additionally, Respondent admits that he is not the only individual who had authority to make investment decision on behalf of the account at issue. Opposition at 2 ("…MHG authorized Mr. Brunet **(and another)** to make certain investment and other decisions on MHG's behalf with respect to its Smith Barney account.")(emphasis added). While this fact alone is not dispositive with respect to his beneficial ownership of the account, it is certainly compelling that Respondent fails to inform the Court that the other individual who had virtually unlimited authority with respect to the account was his wife. Exhibit C. Mrs. Brunet is not registered with any self-regulatory or governmental organization as an investment advisor, and upon information and belief, is not an employee of Pinnacle Capital Ltd. ("Pinnacle"), the investment advisory firm that Respondent claims as his employer. Nevertheless, for no apparent purpose, she was granted broad authority with respect to this account, thus giving it the distinct characteristics of a joint account with rights of survivorship. This type of account is typical for spouses. It is not typical (and somewhat curious) that the wife of a professional investment manager (who is not herself a professional investment manager) would have such broad authority with respect to an account allegedly owned by unrelated individuals.

The facts are clear. Respondent specifically stated that he was a beneficial owner of the Account. He provided no passport other than his own in connection with the opening of the Account. The Account is set up as a *de facto* joint account for Respondent and his wife. During the process of opening and managing the account at issue, Respondent treated it as his own, and made express certifications to that effect to Smith Barney.

No matter how many times, nor in how many different ways Respondent denies beneficial ownership of MHG and the Account, the evidence, by any objective measure, shows otherwise. Regardless, Smith Barney relied upon Respondent's actions and assertions in opening

958814-1                                             4

the Account, and Respondent should now accordingly be estopped to deny his prior representations of beneficial interest because it no longer suits his purposes.

**B.     Respondent May Not Hide Behind Pinnacle.**

Respondent's efforts to hide behind Pinnacle are unavailing. Pinnacle has never been authorized to do business in the State of Florida, is not registered as an investment advisor with the Securities and Exchange Commission, and does not appear to exist as a corporation. In fact, Pinnacle's only appearance with respect to the management of the Account is on a few fax sheets and at the bottom of one email. And when it does appear, the address, telephone number, and fax number are identical to the address, telephone number, and fax number registered to Respondent's personal residence. Composite Exhibit D. The bottom line is that, even if Pinnacle exists, it is, in fact, Respondent's alter ego.[3] He cannot at the same time assert the corporate form as a defense to his improper handling of the Account, while simultaneously failing to register in the State of Florida, observe corporate formalities, provide any showing of capital structure, or even provide simple proof of its existence such that Pinnacle could be properly served and subject to lawsuit.[4]

**C.     Respondent Is Bound To Arbitrate As An Agent OF MHG.**

Respondent cites to *Thomson-CSF, S.A. v. American Arbitration Association* as binding precedent while at the same time ignoring the plain language of the decision. Specifically, the *Thomson-CSF* court clearly stated, "This Court has made clear that ***a non-signatory party may be bound to an arbitration agreement*** if so dictated by the "ordinary

---

[3] Where an individual dominates the operation of a corporation and uses it to conduct his personal enterprise, and there is no showing of capital structure or that the corporation ever observed corporate formalities, a presumption that the individual and the corporation have separate identities is overcome by the alter-ego doctrine. *Ramaria Familienstiftung v. United States of America*, 643 F. Supp. 139, 146 (S.D. Fla. 1986).

[4] Respondent makes much of the fact that arbitration was initially demanded against Pinnacle, but the Petition was only filed against him individually. Had Pinnacle been lawfully registered to do business in the State of Florida, and properly appointed an agent to accept process, it would also be a Respondent in the instant matter.

958814-1                                                                 5

principles of contract and agency." *Thomson-CSF, S.A.*, 64 F.3d at 776 (emphasis added). Respondent fails to provide any binding case law that is directly contrary to this point, and does not provide any legal, logical, or equitable rationale as to why this Court should depart from the *Thomson-CSF* decision.

Respondent also does not dispute the applicability of *American Personality Photos, LLC v. Mason*, but by providing incomplete quotations from this decision, he turns the holding on its head, thereby cautioning the Court that "…it matters whether the party resisting arbitration is a signatory or not.  A court should be wary of imposing a contractual obligation to arbitrate on a non-contracting party.  Compelling a non-signatory to arbitration requires careful consideration."  Opposition at 5 (quoting *Am. Personality Photos, LLC*, 2008 U.S. Dist. LEXIS 107673 at *10-*11).  Respondent, however, omits the sentence that immediately follows the above quote, which reads:

> A willing signatory seeking to compel a non-willing non-signatory into arbitration must establish at least one of the theories listed in *Thomson-CSF*.

*Am. Personality Photos, LLC*, 2008 U.S. Dist. LEXIS 107673 at *11.  Despite Respondent's efforts to bury this aspect of the *American Personality Photos LLC* holding, it is clear that under theories of agency and estoppel (both listed in *Thomson-CSF*), a non-signatory may be compelled to arbitration.

Inexplicably, despite admitting that New York law is controlling, Respondent submits that the Court should rely upon irrelevant and non-binding cases from Oregon, Texas, and Wisconsin, despite the fact that New York law is clear, unequivocal, and definitive.

Setting aside the white noise, incomplete quotations, and irrelevant case law propounded by Respondent, the central point is easy to understand, as clearly espoused in *American Personality Photos LLC*, and perhaps most importantly, acknowledged by Respondent:

> Where the alleged misconduct of the agent relates to the agent
> behavior as an officer or director or the agent's capacity as agent of
> the corporation, courts permit the agent to benefit from arbitration
> agreements entered into by his or her principals.

*Id.* at *13. Respondent admits he was an agent of MHG. He is thus bound by the arbitration clause contained within the Client Agreement. It's really that simple.

### D.     Respondent Is Estopped From Avoiding Arbitration.

Parties who derive a direct benefit and knowingly exploit an agreement containing an arbitration provision are estopped from avoiding arbitration despite never having signed the agreement. *Thomson-CSF*, 64 F.3d at 778. Notwithstanding this very simple holding, Respondent misleadingly argues that the plaintiff in *Thomson-CSF* used an agreement containing an arbitration provision (that it had not signed) as a mechanism to force a competing company out of the market, and that the plaintiff's exploitation of the agreement to garner a greater share of the market was an indirect, rather than direct, benefit. While the court so held, Respondent's recitation of the *Thomson-CSF* decision is characteristically incomplete. It is vital to note that the court went on to say:

> Had Thomson directly benefited from the Working Agreement by
> seeking to purchase equipment from E & S or enforcing the
> exclusivity provisions of the Agreement, it would be estopped
> from avoiding arbitration.

*Id.* at 779.

The Client Agreement gave Respondent the ability to make trades in the Account in the same way the agreement in *Thomson-CSF* gave the plaintiff the right to purchase equipment. The difference here is that the plaintiff in *Thomson-CSF* made no purchases, and thus, derived no direct benefit. Respondent does not dispute that he made trades pursuant to the Client Agreement and accordingly, generated a management fee. In fact, this controversy would not exist if not for Respondent's negligent and improper trading. Respondent's trading, and

resultant ability to earn a fee, is precisely the type of direct benefit that the *Thomson-CSF* court stated would estop a non-signatory from avoiding arbitration.

Moreover, Respondent's argument that he did not receive a direct benefit is logically and legally deficient.  First, he argues that he did not receive any services or other benefits from Smith Barney as a result of the Client Agreement, but that MHG instead received such services and benefits.  However, ***Respondent certified that he was an owner of MHG***.  Exhibit A.  As the beneficial owner of MHG, it goes without saying that he received a benefit, and Respondent's statement that MHG received a direct benefit is essentially an admission that he himself received same.  Even assuming, *arguendo*, that he was not the beneficial owner of MHG, he received financial remuneration as a direct result of being able to serve as investment manager pursuant to the provisions of the Client Agreement.  It simply defies logic to say that he received no benefit.

Respondent also admits that a direct benefit was realized, but argues that it was realized by Pinnacle, not him.  As previously stated, Pinnacle has never been authorized to do business in the State of Florida, is not registered as an investment adviser with the Securities and Exchange Commission or the State of Florida, has failed to observe corporate formalities, provide any showing of capital structure, nor even provide simple proof of its existence.  And to the extent that it does exist, it exists solely as a personal vehicle for Respondent to use or hide behind when it suits him to do so – Pinnacle has the same address, telephone number, and fax number as Respondent, and upon information and belief, has no "employees" other than Respondent.  Finally, if, in fact, Pinnacle is a true investment adviser, a viable business entity, and employer of Respondent, MHG would likely have granted management authority directly to

958814-1                                                             8

Pinnacle, not to Respondent and his wife. Based on the foregoing, the acknowledged direct benefit to Pinnacle operates as a direct benefit to Respondent.

In another obvious attempt to distract the Court from the central issue, Respondent curiously states that until the shortfall arose in the account at issue, Smith Barney never claimed he was personally liable. He is correct in this regard. There would have been no logical reason for Smith Barney to assert that anyone, much less Respondent, would have been liable for anything, because there was nothing to be liable for. In any event, Respondent certified that he was the owner of the Account, and thus, from the very beginning, Smith Barney sought recompense not from MHG, but from Respondent.

Further, Respondent argues that any management fees would have been earned by Respondent whether the Account was at Smith Barney or at another institution. This is of no moment. The Account was, in fact, at Smith Barney, and Respondent is therefore liable to Smith Barney for his improper actions. Had he not signed the Client Agreement, he would not have been able to earn his fee. Whether he could have done so elsewhere is completely irrelevant.

### III.   CONCLUSION

For the foregoing reasons and those set forth in the Petition, Smith Barney respectfully requests that the Court compel Respondent to submit to arbitration.

Dated: May 22, 2009  
      Fort Lauderdale, Florida

Respectfully submitted,

/s/Coren H. Stern  
Coren H. Stern (Florida Bar No. 0644218)  
cstern@bressler.com  
Bressler, Amery & Ross, P.C.  
2801 S.W. 149th Ave., Suite 300  
Miramar, FL 33027  
Telephone: 954-499-7979  
Facsimile: 954-499-7969

## CERTIFICATE OF SERVICE

I hereby certify that I caused the foregoing *Reply in Support of the Petition to Compel Arbitration* to be served this 22nd day of May, 2009 to Humberto Ocariz, Shook, Hardy & Bacon, 2400 Miami Center, 201 S. Biscayne Blvd., Miami, Florida 33131-4332 via the Court's CM/ECF system.

/s/Coren H. Stern
Coren H. Stern